AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Black Apple iPhone w/ black case Seizure No. 2023271400021401 (Target Device 2) | ) ) ) |

Case No.  **23mj1418**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC sec. 1591 | Sex Trafficking by Force, Fraud, and Coercion |
| 18, USC sec. 2422 | Coercion and Enticement of a Minor to Engage in Prostitution |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Aron Marcellus, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Special Agent Aron Marcellus, HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:   _____04/21/2023_____

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Karen S. Crawford, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Aron C. Marcellus, Special Agent with Homeland Security Investigations, being duly sworn, hereby state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant to search the following electronic devices, as described in Attachment A-1 and A--2, and seize evidence of crimes, specifically, violations of Title 18, United States Code, Sections 1591 and 2422, as more particularly described in Attachment B-1 and B-2:

Black Apple iPhone w/ clear case

Seizure No. 2023271400021301

**("Target Device 1")**

Black Apple iPhone w/ black case

Seizure No. 2023271400021401

**("Target Device 2")**

This search supports an investigation conducted by Homeland Security Investigations (HSI), in conjunction with the San Diego Human Trafficking Task Force (SDHTTF), into Deondre Demetris PORTER ("PORTER") and Aaliyah WHITE ("WHITE") who are charged with the crimes mentioned above. A factual explanation supporting probable cause follows.

2. **Target Device 1** and **Target Device 2** were seized on April 17, 2023 during PORTER'S and WHITE'S arrest for sex trafficking of an juvenile female (JF) through force and threats of force and coercion and enticement of a minor to engage in prostitution. **Target Device 1** and **Target Device 2** are currently in the possession of SDHTTF.

3. Based on the information below, there is probable cause to believe that a search of **Target Device 1** and **Target Device 2** will produce evidence of the aforementioned crimes, as described in Attachment B-1 and B-2.

4.     The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining search warrants for **Target Device 1** and **Target Device 2**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

6.     I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since September 2017. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, and organized criminal activity.  I am currently assigned to the Border Enforcement Security Task Force (BEST), Human Smuggling/Trafficking Group specializing in a variety of criminal and financial investigations. My primary responsibilities include investigating human smuggling/ trafficking and narcotics violations.  These investigations include, but are not limited to, investigations involving wire fraud, money laundering, financial crimes and bulk cash smuggling.

2

7.     Prior to being a SA with HSI, I was a Supervisory U.S. Border Patrol Agent (SBPA) with U.S. Customs and Border Protection (CBP) from April 2017 to September 2017 and a U.S. Border Patrol Agent (BPA) from February 2008 to March 2017.  As a BPA I conducted law enforcement field operations, interviews, made arrests and prepared administrative and criminal cases related to the violation of immigration and narcotics laws.

8.     Since October 2019, I have been assigned to the SDHTTF where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activity of criminal gang members and have performed a variety of related investigative tasks.

9.     My experience as an HSI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

10.     Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.     Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit business on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b.     Individuals involved in illicit commercial sex often solicit clients through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

c.     Individuals involved in illicit commercial sex maintain records of correspondence relating to client contact information as well as travel and lodging arrangements involved in such illegal activity;

d.     Individuals involved in illicit commercial sex maintain documents and files containing names of associates and/or coconspirators involved in prostitution;

e.     Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

f.     Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removal hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility, coordinate illicit activities, and to provide pimps and prostitutes with instant access to phone calls, voice messages, text messages, instant messaging (IM) and internet based correspondence. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, and phone numbers in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with co-conspirators and clients, as well as telephone books containing contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves as well as other coconspirators for the purpose of electronic advertising and promotion of prostitution. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, DVD ROMS, pagers, money chips, thumb drives, flash drives, and portable hard drives;

g.      Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find clients and prostitutes. They use Facebook messaging applications to communicate with prostitutes and customers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with other pimps, prostitutes, complicit businesses, and clients. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of co-conspirators and clients, including contact information for co-conspirators and clients. Individuals involved in illicit commercial sex also utilize social media to store and display, commonly known as posting, photographs, videos, and text of themselves as well as other co-conspirators for the purpose of electronic advertising and promotion of prostitution.

11.      Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs "a" through "g" is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

12.      On Sunday, April 9th, 2023, at approximately 1300 hours, San Diego Police Department Officers responded to a report of a robbery at 3792 4th Avenue, in the city and county of San Diego. This location is a 7-Eleven Store. The radio call stated a female was hit by a vehicle and her phone was stolen. Upon arrival, officers contacted the 16 year-old victim, JF. JF told the officers, in essence, that a male subject known to her as "Deondre" (later identified as Deondre Demetris PORTER ("PORTER")) and an adult female physically assaulted her, strangled her, prevented her from leaving, and ultimately stole one of JF's cellphones out of her hand. PORTER and the adult female left the scene. JF gave a physical description of PORTER and the adult female. JF also reported that

PORTER is known to her as "Count Up" and the adult female goes by "Kash". JF told the officers that PORTER's Instagram account is "2130_Countup" and his phone number is ███████5961. JF stated the adult female's phone number is ███████2461. JF showed officers a photo on her phone of her standing in front of PORTER's vehicle, a white BMW bearing CA/9DOC085. A records check of the license plate revealed the vehicle is registered to Deondre Demetris PORTER. Due to the extent of JF's injuries observed at the scene, to include, bruising and abrasions to her left knee, right eyebrow, right leg, and right shoulder, as well as redness around her eyes and neck. She was transported by ambulance to the emergency department at UCSD Hillcrest where she was admitted for emergency care.

13.    Two witnesses were interviewed. L██ F██ reported seeing a white BMW quickly leave the area and JF laying on the ground. She believed JF had been hit by the white BMW. JF told L.F. that she was 16 years old and a trafficking victim. M████ F████ reported seeing JF either jumping or being thrown out the rear driver's side seat of a white BMW, with her belongings. JF's top was pulled down exposing her breasts.

14.    Based on this information, officers contacted the San Diego Human Trafficking Task Force for further investigation.

15.    On April 9th, at about 1530 hours, SDPD/SDHTTF Task Force Officers (TFO) arrived at UCSD Hospital – Hillcrest and interviewed JF. The following is a synopsis of JF's statement and has been edited for clarity and brevity and is not a verbatim account.

**STATEMENT OF JF**

16.    JF began communicating with PORTER on Instagram (via her account "████████████ and PORTER's account "2130_countup") approximately three days ago and planned to meet. She believed the intent was to "drink and smoke" and did not initially believe him to be a trafficker. PORTER picked JF up from the hotel in which she was staying with another friend and drove her to an unknown hotel in Victorville. At this hotel, she met two adult females. One of the females left shortly after JF's arrival. The other female JF identified as "Kash" or "Aliyah." JF did not know this person's true identity

6

and referred to her as Kash throughout the interview. JF also referred to Kash as PORTER's bottom.[1] JF stated Kash is a Black female, slim, tall, and wearing a wig. JF stated Kash has butterfly tattoos on her neck and hands. JF recalled Kash pinching her out of jealousy after getting to the hotel in Victorville.

17.     JF stated that once at the hotel in Victorville it became clear that PORTER is a trafficker as he began telling JF his rules[2] in person. JF recalled his rules included that she had to "work all day everyday" and had a $1500 quota each night/using ten condoms[3]. If she didn't make quota, JF stated "he would get to beating my ass but he wouldn't beat the other bitch up and she wouldn't make no money." She also explained that all of her earnings from commercial sex would be collected by PORTER and he would spend JF's money on Kash. JF estimated giving PORTER over $1,000. PORTER told JF that if she wanted to leave she would have to pay an exit fee[4] of $5,000 and give him both of her phones. JF stated PORTER required her to be advertised for commercial sex on websites such as Private Delights and MegaPersonals.[5] JF described PORTER setting up a MegaPersonals account for her by having JF pose for a photo with the ID of Kash or

[1] Based on my training and experience, I know the term bottom to refer to a prostituted person under the control of a trafficker who handles much of the enforcement and day to day dealings within the pimping and prostitution subculture. The bottom is often used to shield the trafficker from legal troubles. The trafficker also utilizes the bottom role to pit the prostitutes under their control against one another, vying for that position, as it often means a reduced amount of commercial sex acts they have to perform.

[2] Based on my training and experience, I know the term rules to commonly refer to a set of expectations a pimp or trafficker has for a prostitute under their control.

[3] Based on my training and experience, I know the term quota to refer to a trafficker's expectation of how much money a person under their control is required to make before they can stop engaging in commercial sex for that time period. This may be a dollar amount or an amount of condoms used.

[4] Based on my training and experience, I know the term exit fee to refer to an amount of money a prostituted person is required to pay to be able to leave their trafficker; this amount is usually an unobtainable amount.

[5] Based on my training and experience, I know these websites primary usage is for the advertising of commercial sex.

another girl[6] and then posting photos of JF in the advertisements. JF believed the setup of the account and posting of advertisements occurred using Kash's trap phone.[7] JF stated that PORTER would communicate with the sex buyers responding to JF's ads and direct JF's commercial sex activity both in San Bernardino and San Diego using his phone. She stated she observed PORTER to be the only person to use his phone; she did not see anyone else other than PORTER using his phone. JF stated she told PORTER she was 16 years old, and he did not care. JF stated PORTER told Kash that JF was 16 years old. JF stated that PORTER asked to have sex with her, but she told him that due to being on her menstrual cycle she could not.

18.     JF stated she, PORTER, and Kash initially left Victorville to go to G Street in San Bernardino[8]. However, when PORTER learned JF had contacts in San Bernardino he decided it would be better to travel to San Diego instead to further isolate JF. Once in San Diego, JF stated they checked into a hotel room at a Motel 6 and stayed for one night. JF looked at a map and believed she was at the Motel 6 Downtown San Diego located at 1546 2nd Avenue in the city of San Diego. JF recognized a picture of the hotel, specifically the windows and parking lot. JF did not know who booked the room and could not remember in what room they stayed. JF stated that she was required to do incall, outcall, and car date[9]

---

[6] Based on my training and experience, I know MegaPersonals requires users to take a photo with an ID showing they are an adult as age verification in order to make an account to post commercial sex ads. For minors this is often defeated by using a similar enough looking person's ID, such as in this case, or other means such as buying an already active account or having an adult create the account themselves.

[7] Based on my training and experience, I know a trap phone in this context to refer to a phone used for the purpose of prostitution/illegal activity.

[8] Based on my training and experience, I know G Street in San Bernardino to be a blade/area in which street level prostitution is publicly available.

[9] Based on my training and experience, I know an incall to be a prostitution encounter where the sex buyer travels to the prostituted persons location; an outcall to be where the prostituted person travels to the sex buyers locations; a car date to be a prostitution encounter that happens in a vehicle.

commercial sex encounters from online advertisements and walk the blade[10] on Roosevelt Avenue.[11] While walking the blade, PORTER would be in his vehicle circling the area. When engaged in commercial sex encounters at the hotel, PORTER and Kash would wait in the hotel room bathroom. She estimated completing three $500 commercial sex encounters each day while in San Diego. JF believed she had deleted any messages she had with PORTER, per PORTER's directions.

19.     Prior to the assault, JF stated PORTER and Kash were mad at her for being "kidnapped" twice. JF stated that earlier that day she was walking the blade on Roosevelt Avenue and PORTER told her she had ten minutes to get a "date"[12], otherwise she would get "beat." JF got into a vehicle after negotiating a $200 date. JF was not able to provide specific details but alleged this person was trying to kidnap her. She was able to get away and as a result, PORTER assaulted JF. On a second occasion, JF got into a vehicle with who she believed to be a sex buyer. The subject was armed with a handgun and disclosed he planned to rob PORTER. JF was able to escape the situation once again.

20.     Following these incidents, JF was in the white BMW with PORTER and Kash. PORTER and Kash began arguing with JF and JF attempted to escape the vehicle. JF stated Kash prevented JF from exiting the vehicle by closing the door when JF would open it to escape. JF stated Kash began striking her on the face and back of her head with both open hand blows and closed fist punches. Kash then began strangling JF with both hands, feeling both of her thumbs over her airway; JF estimated the strangling to last approximately seven seconds. JF recalls "I passed out for a second." JF believed Kash had additional "animosity" towards her; but later expressed that Kash had been nice to her early

---

[10] Based on my training and experience, I know a blade, track, or stroll as a geographical area known for prostitution activity, where prostitutes gather to be solicited by those seeking to exchange sex for money.

[11] Based on my training and experience, Roosevelt Avenue is a known blade in San Diego County.

[12] Based on my training and experience, the term date commonly refers to a prostitution encounter.

in the day and then started hitting JF because her "boyfriend told her to." JF explained that, at this point, PORTER began striking the back of her head and her face with both open hand blows and closed fists. JF stated she believed the two were trying to kill her as she heard them both make statements to the effect of, "I'm going to kill you bitch" and "you're going to get killed today." JF stated she was able to exit the vehicle. JF also stated that she felt a push on her back, but also described trying to get out of the vehicle. Upon exiting, JF recalls landing on her head and being positioned on the ground towards the front of the vehicle. From this position she could see PORTER driving the vehicle and saw the vehicle drive forward with the front tire coming towards her head. Based on the actions and statements of PORTER and Kash, she believed PORTER was trying to run her over in an effort to kill her. JF was able to quickly get up off the ground and move out of the way of the vehicle; JF believed that had she not moved, she would have been hit by the vehicle driven by PORTER. JF reiterated this occurred in the 7-Eleven parking lot.

21.    JF stated that during the assault PORTER and Kash were trying to forcibly take her cellphone and strip her of her clothing. JF stated PORTER or Kash was able to take one of her cellphones, but that she was able to hold onto her other cellphone.  Prior to our arrival at the hospital, JF was able to locate her stolen phone using the Find my Phone app and saw her phone was in Riverside County. However, eventually she was no longer able to track the stolen phone's location.

22.    During the interview, JF showed TFOs a photo of her standing in front of PORTER's vehicle as seen below. The vehicle in the photo, and as reported to the SDPD officers by JF, also matches the description of the vehicle given by witnesses at the scene.



23.    JF gave verbal and written consent to search the contents of her cellphone and create a forensic copy of the contents.

24.    After obtaining JF's statement, Officer Addison provided a California Driver's License photo matching the registered owner and address of the white BMW for Deondre Demetris PORTER CDL# ▮▮▮▮▮▮ and DOB of ▮▮▮▮▮▮ Upon being shown PORTER's driver's license photo, JF immediately recognized the person to be who she knows as Deondre and "Count Up."

**DIGITAL EVIDENCE**

25.    A digital forensic extraction of JF's cell phone was conducted. Below are descriptions of some of the relevant content found in the extraction.

26.    Within the messages stored in the iMessages application, there was a conversation with the phone number ▮▮▮▮5961 previously reported by JF as PORTER's phone number. The conversation begins on Wednesday, April 5th, 2023, as seen below. In the screenshot below and left, messages can be seen where JF asks PORTER if she has any requests for commercial sex. PORTER replies with a screenshot of sex buyers he is communicating with for JF. In screenshot below right, the conversation continues with PORTER directing JF to video call the sex buyer, directing her how to interact with

1  the sex buyer, and telling her how much he negotiated for the commercial sex act she is to

2  perform.

 

22  / /

23  / /

24  / /

25  / /

26  / /

27  / /

28

27.   In the below messages, PORTER continues to tell JF what he expects her to charge for commercial sex acts and how to interact with sex buyers:




/ /
/ /
/ /
/ /
/ /
/ /

28.    In the below messages PORTER arranges a prostitution encounter for JF. Afterward, she tells PORTER the sex buyer paid via Cash App. PORTER responds by sending JF his Cash Tag for her to use to transfer her earnings to him. She responds with a screenshot of her sending PORTER $224. In the screenshot of the Cash App transaction, PORTER's name can be seen as the owner of the account in which she is sending money.

 

/ /

/ /

14

29.    In the messages to the below left, PORTER tells JF that she has multiple dates in quick succession that he has arranged for her. Afterward, he asks her how she is feeling. In the messages to the below right, JF tells PORTER she feels like "shi."

 

30.    Following, she explains that she has cramps as seen below [note: during the interview she explained that her menstrual cycle had begun during this time.] However, she is not allowed to get treatment until after completing additional commercial sex acts. He emphasizes his expectation for continual engagement in commercial sex by telling her he wants her to engage in commercial sex for 30 days straight:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




31.     The above is a short synopsis of JF and PORTER's text message conversation. There are several messages exchanged between and/or after the above screenshots.

32.     An Instagram direct message conversation between JF and PORTER was also located within the extraction contents. The first messages begin on Thursday April 6th, 2023 and continue through 3:12 PM on April 9th. Of significance, the two are initially conversing where it is clear they know one another. On April 9th at 12:20PM, about 40 minutes prior to the assault on JF, PORTER tells JF, "U puttin yoself in a bad situation." At 3:12PM, JF tells PORTER, "IMMA MAKE SURE YO BITCH GET BEAT TFC UP

LIKE YALL BEAT ME UP." Based on the timing and context of the assault, this exchange appears to be JF threatening retaliation for the assault by PORTER and Kash. PORTER responds, "Wrong person" seemingly claiming ignorance of the matter.

33.    The extraction of JF's cell phone also contained a Cash App account for JF that had transactions with "Deondre Porter" using an account name consistent with PORTER's known moniker. The transaction history between JF and PORTER was consistent with their messages and JF's statement that her earnings were given to PORTER.

34.    The extraction of JF's cell phone contained an exchange between JF and the phone number JF reported as belonging to Kash (███████2461). In these messages, Kash is directing JF to share her location.[13] JF is then communicating with Kash about presumably a sex buyer not wanting to pay her for the commercial sex acts up front, as is typical in this type of encounter. Lastly, Kash is once again wanting to know JF's whereabouts.



---

[13] Based on my training and experience, it is common for the trafficker to track the location of a prostitute under their control; this role may also be given to the bottom to assist in managing the prostitute under the trafficker's control.

35.     On April 10th, TFO Dierdorff and Wiener followed up with JF. During this contact, additional photographs were taken of JF's injuries to her face, neck and knee. In the photographs, JF has visible bleeding in her eyes, extensive bruising under eyes, apparent abrasions to the side of her face, strangulation marks on her neck, and large scrapes on her knee.

36.     JF was asked to identify which messages in her phone were between her and PORTER; she pointed to the messages with phone number ██████5961. JF was also asked to identify which messages in her phone were between her and Kash; she pointed to the messages with phone number █████2461. When asked about the messages exchanged with Kash as seen above, JF explained that Kash was in essence trying to get JF's location to bring JF back under PORTER's control.

## COMMERCIAL SEX ADS

37.     Using a law enforcement program that aggregates commercial sex ads from sites known for prostitution, a search was conducted for PORTER's phone number (████ █████5961) and yielded ads depicting JF and advertising her for a two-girl special (commercial sex act with two prostituted persons) in San Diego between April 7th and April 9th. The ad is pictured below but edited to remove explicit photos. As seen below, PORTER's phone number is listed in the ad as well as JF's nickname of "Dyamond." In addition, based on training and experience, TFOs believe this to be a prostitution ad based on the language including the use of the phrase "incalls and outcalls."

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

38.     Similarly, when searching by PORTER's number, ads were located depicting who TFOs believe to be Kash. Those ads were also posted in San Diego on April 9th, as seen below. The ad has been edited to remove explicit photos. TFOs believe this to be Kash since, based on JF's statement, only the three of them were in San Diego together during this time, and the nickname listed in the ad is "Kashh".

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /



39.     Ads for Kash listing her own phone number (████ 2461) were also located. The ads were posted between April 7th and April 9th, in San Diego, and list the same name of "Kashh."

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

40.     Uniquely, in the ads of JF listing PORTER's phone number and the ad of Kash listing Kash's phone number, following their nickname is the same emoji. This emoji is not in the ad of Kash listing PORTER's phone number.

### HOTEL ROOMS

41.     In messages exchanged between JF and PORTER, PORTER sends JF the address to their hotel room, 15822 Mojave Drive, Victorville, CA 92394. A Google search for this address linked it to the Economy Inn. A Google search for the Economy Inn's rooms yielded the below photo showing the bedding used (below left). In JF's statement, she explained that when she first arrived at the hotel room in Victorville, Kash was there with another female who left shortly after. From a review of the ads posted under Kash's phone number, there is an ad with a photo depicting who TFOs believe to be Kash and the unknown female. The bedding is the same as the photo on the left. The ad was posted on April 5th, the same day that JF and PORTER began messaging one another.

 

42.     On April 11th, I went to the Economy Inn in Victorville and located a record that PORTER was registered to room 204 from April 2nd to April 6th; the hotel had a copy of PORTER's driver's license on record with the registry. The front desk manager recognized PORTER and said he was staying at the hotel with PORTER's "girlfriend" who was registered to room 203. Records for room 203 showed it was registered to L█████ █████ from April 2nd to April 3rd. The hotel had a copy of L.E.'s driver's license on record with registry. TFOs compared the photo of L.E. to photos in the ads of Kash and could not conclusively say they are one in the same person. Therefore, on April 12th, a TFO assigned to the Orange County Human Trafficking Task Force showed JF a photo of L.E. JF believed L.E.'s complexion was too light to be Kash.

43.     On April 12th, TFOs went to the Motel 6 Downtown San Diego location and obtained registry information. The front desk manager provided a registration for room 320 in PORTER's name, providing phone number ██████5961. PORTER checked in on April 7th at about 3:00PM and checked out on April 8th, at about 1:00PM. PORTER's stay at the hotel was abruptly ended due to hotel staff discovering he had two unregistered guests (females) at the room with him and the occupants being smoked in. As a result he was asked to leave the premises. The surveillance footage reviewed shows PORTER, JF, and an unknown female enter and exit the room on multiple occasions. There was also observed footage of the vehicle in which PORTER arrived at the hotel in, a white 4-door sedan, consistent with the make and model of PORTER's white BMW. Motel 6 staff did not note the make/model/plate of the vehicle.

**SURVEILLANCE FOOTAGE**

44.     On April 12th, 7-Eleven corporate sent TFO Buchholtz surveillance footage of their parking lot. The following is a synopsis from a review of that footage. At about 1:03 p.m., a white BMW matching the description of PORTER's vehicle enters the frame and stops in the driveway of the parking lot as though it is entering the roadway on Robinson Avenue. The vehicle's license plate cannot be read from the video. The rear driver's side passenger door opens and clothing/belongings are thrown out of the vehicle as the vehicle continues to move towards the roadway. The vehicle leaves the frame of the video. A short time later, JF can be seen entering the frame from the direction that the vehicle can be seen exiting the frame. She appears to be quickly moving away from the area of the vehicle and pulling up her top. None of the other camera angles captured JF exiting the vehicle. Additionally, due to the dark tint of the windows, the occupants cannot be seen.

45.     On April 12, TFO Buchholtz received surveillance footage from Robinson Plaza, a shopping center located along Robinson Avenue and Fourth Avenue. In the footage, a white BMW matching the description of PORTER's vehicle is seen driving into the 7-Eleven lot and coming to a stop. A male exits from the driver's seat, opens the rear driver's side door, and begins making quick movements with his arms consistent with a striking motion. The male then gets back into the driver's seat and the vehicle pulls out onto Robinson Avenue. As the vehicle exits onto Robinson Avenue, a figure consistent with JF's build and description is ejected out of the same rear driver's side door. The ejected passenger appears to land on their back near the vehicle's rear driver's side tire. The vehicle then continues down Robinson Avenue with the rear driver's side door still open. Multiple pedestrians in the vicinity can then be seen assisting the ejected passenger.

**APRIL 17, 2023 ENCOUNTER**

46.     On April 17, 2023, SDHTTF members developed information about the whereabouts of PORTER and Kash. PORTER and Kash were subsequently stopped after they exited a motel parking lot in San Bernardino, CA. Kash was then identified as Aaliyah White (WHITE), date of birth ████████ WHITE's appearance matched that of the

23

individual depicted in the Megapersonals ads advertising commercial sex services under the name "Kashh", utilizing both PORTER's ████5961 phone number and Kash's ████2461 phone number.

## IDENTIFICATION OF THE TARGET DEVICES

47.    PORTER and WHITE were stopped while in PORTER's white BMW bearing CA/9DOC085. PORTER was in the driver's seat and WHITE was in the front passenger's seat. After PORTER and WHITE exited the vehicle, there was one cell phone on the driver's seat and one cell phone on the front passenger's seat.  At this point TFOs called the numbers associated with both Target Devices.  When TFOs called ████5961, the cell phone on the driver's seat, **Target Device 1** (a black Apple iPhone with a clear case) began to ring. When TFOs called ████2461, the cell phone on the front passenger's seat, **Target Device 2** (a black Apple iPhone with a black case) began to ring. **Target Device 1** and **Target Device 2** were then seized under seizure no. 2023271400021301.

## METHODOLOGY

48.    It is not possible to determine, merely by knowing the mobile electronic device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Mobile electronic devices, including cellular telephones and tablets, can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers and installable software now allow for their subscribers and users to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many mobile electronic devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some

solutions for acquiring some of the data stored in some mobile electronic device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

49.    Following the issuance of this warrant, I will collect **Target Device 1** and **Target Device 2** and subject them to analysis. All forensic analysis of the data contained within **Target Device 1** and **Target Device 2** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

50.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN DATA

51.    Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

### CONCLUSION

52.    Based on the foregoing, I submit there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, 18 U.S.C. §§ 1591, as described in Attachment B, will be found in the property to be searched, as described in Attachment A.

53.    I therefore respectfully request that this Court issue warrants authorizing me, an HSI Special Agent, or another law enforcement officer, to search **Target Device 1** and

**Target Device 2** as described in Attachments A-1 and A-2 and seize the items listed in Attachments B-1 and B-2.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Aron C. Marcellus
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 21st day of April 2023.

Honorable Karen S. Crawford
United States Magistrate Judge

26

## ATTACHMENT A-2
## ITEM TO BE SEARCHED

The property/items to be searched is/are described as follows:

Black Apple iPhone w/ black case

Seizure No. 2023271400021401

**(Target Device 2)**

**Target Device 2** is currently being held at the San Diego Human Trafficking Task Force located at 9425 Chesapeake Dr. San Diego, CA 92123.

# ATTACHMENT B-2
# ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, photographs, audio files, video, telephone numbers, contact information, web browsing history, documents, data stored within applications, and location data, for the period of March 17, 2023, up to and including April 17, 2023:

a.    tending to indicate efforts to recruit, entice, harbor, transport, provide, obtain, or maintain a person for the purposes of engaging in a commercial sex act;

b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate human trafficking;

c.    tending to identify co-conspirators, criminal associates, or others involved in human trafficking;

d.    tending to identify funding sources, bank accounts, and financing methods involved in human trafficking;

e.    tending to show efforts to solicit commercial sex acts on websites including but not limited to megapersonals.com or skipthegames.com;

f.    tending to identify travel to or presence at locations used for commercial sex acts;

g.    tending to identify the user of, or persons with control over or access to, the subject phone; and/or

h.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 18, United States Code, Sections 1591 and 2422.**

The seizure and search of the cellular phones shall follow the procedures outlined in the methodology section in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phones may be searched for the evidence above.